1998-NMCA-043

956 P.2d 824

**Frank VENAGLIA, Ann P. Venaglia, and Roy J. Venaglia, Plaintiffs–Appellants,**

**v.**

**Roy M. KROPINAK, Defendant–Appellee.**

**No. 17660.**

Court of Appeals of New Mexico.

Feb. 3, 1998.

Robert D. Montgomery, Albuquerque, for Appellants.

David H. Thomas, III, Alison I. Arias, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, for Appellee.

## OPINION

HARTZ, Chief Judge.

(1)  The Appellants, Frank Venaglia, Ann P. Venaglia, and Roy J. Venaglia (the Venaglias), sued Roy M. Kropinak on his guarantee of a $68,000 promissory note from Downtown Business Center, Inc. (DBC) to the Venaglias.  On cross-motions for summary judgment the district court granted Kropinak's motion and denied the Venaglias'.  The Venaglias appeal, asking that we set aside the summary judgment against them and order the district court to enter summary judgment in their favor.  This appeal requires us to examine suretyship defenses under the Uniform Commercial Code (the UCC) and the common law, and the relationship between these two sources of law.  We hold that the record before us will not sustain a summary judgment for either party.  We therefore reverse the summary judgment and remand for further proceedings.

## I.  BACKGROUND

(2)  On August 3, 1992 DBC entered into a purchase agreement to buy from the Venaglias a commercial property (the Property) in downtown Albuquerque.  The negotiated price was $470,000, with $90,000 cash due at closing and the $380,000 balance payable under a standard form real estate contract.  Although there is some dispute regarding precisely what documents were executed by the time the transaction closed, it is not contested that (1) on November 19, 1992 DBC entered into a real estate contract (the Real Estate Contract) to purchase the Property from the Venaglias for $460,000, (2) the contract acknowledged the receipt of a $90,000 cash down payment, and (3) $68,000 of the down payment was in the form of a promissory note (the Promissory Note) dated October 30, 1992.  The text of the note was as follows:

After date, as hereinafter set forth, for value received, I, we, or either of us, promise to pay to the order of FRANK VENAGLIA, ANN P. VENAGLIA and ROY J. VENAGLIA, Albuquerque, New Mexico, the sum of Sixty Eight Thousand ($68,000.00) Dollars in the manner following, that is to say:

Nineteen Thousand Dollars ($19,000.00), or more, on or before April 30, 1993, and the balance of Forty Nine Thousand Dollars ($49,000.00), plus all accrued interest, on or before October 30, 1993.

The said installments shall include interest on said principal amount and/or on the unpaid balance ther[e]of at the rate of ten per centum (10%) per annum, and when said installments are paid, they shall be apportioned between interest and principal, and applied first to the payment of all interest due at date of payment, and the balance applied on the princ[i]pal amount.

If any one of said installments is not paid within ten (10) days after the same becomes due and payable, the whole of the principal sum then remaining unpaid, together with the interest that shall have accrued thereon, shall forthwith become due and payable without notice or demand, at the option of the holder of this note.

The makers, endorsers, and sureties hereof hereby severally waive protest, demand, presentment, notice of dishonor, and notice of protest in case this note, or any installment due thereunder, is not paid at maturity, and agree that after maturity of this obligation or any installment thereof, the time of making payment of the same may be extended without prejudice to the holder and without releasing any makers, endorsers or sureties hereof.

The maker, all endorsers, and sureties agree to pay, in addition to all other sums due hereunder, all costs and expenses of collection of this note and/or enforcing the same including a reasonable attorney's fee at the time of collection and/or enforcement should this note be placed in the hands of an attorney for collection and/or enforcement, or is collected or enforced through bankruptcy, probate, or other judicial proceedings.

The note was signed by Robert J. Doucette as president of DBC. Immediately beneath Doucette's signature was the heading "GUARANTORS (individually)," under which were the signatures of William W. Anderson, Kropinak, and Doucette. No collateral secured the note.

(3) DBC defaulted on the Promissory Note in October 1993. When the guarantors failed to pay, the Venaglias sued DBC, Anderson, and Kropinak. Pursuant to a stipulated order, the Venaglias obtained judgment against all three defendants in the amount of $48,727.91 on August 29, 1994. (As will be explained below, the judgment against Kropinak was later set aside.)

(4) In the meantime DBC had continued to make some payments under the Real Estate Contract. But in August 1994 DBC failed to make any payments and the Venaglias terminated the contract effective September 19, 1994. On October 11, 1994 the Venaglias entered into an Agreement of Compromise and Mutual Release (the Settlement Agreement) with DBC, signed on behalf of DBC by its then president Ron Perea. Under the agreement DBC relinquished the Property to the Venaglias and the parties mutually released any potential claims against one another. The pertinent terms of the agreement are as follows:

1. [The] Venaglia[s] release[] DBC, together with its shareholders, officers, directors and affiliates, from any and all further liability under the [Real Estate Contract] or as result of their default of the provisions of the [Real Estate Contract], including without limitation, past due amounts, holdover rents, property taxes upon the property for the year 1993, costs of collection, attorneys' fees, and other amounts; **provided, however, that this release shall not include** amounts due to [the] Venaglia[s] under that certain judgment against DBC and others in the face amount of $48,727.91 entered on or about August 29, 1994 . . . .

2. DBC releases [the] Venaglia[s] from any and all claims which it may have or assert, of any nature whatsoever, arising from, under or in connection with, the [Real Estate Contract] or the property described in the [Real Estate Contract], and waives and releases any and all rights of any nature whatsoever which it may have or assert to the property. DBC acknowledges that it has "equity" in the property, and that it understands that even in the event of a default under the [Real Estate Contract] it might be determined by a court of competent jurisdiction to be entitled to recoupment or reimbursement of certain amounts by reason of its payments toward the purchase price of the property and by reason of amounts expended by it to preserve, maintain or improve the property. By its execution of this Agreement, DBC waives any right which it may have to claim such recoupment or reimbursement in any amount whatsoever.

3. DBC shall immediately take all reasonable steps to deliver sole possession of the property to [the] Venaglia[s], to terminate any leases upon the property granted by DBC to any person, and to cooperate with [the] Venaglia[s] in securing to [the] Venaglia[s] sole possession of the premises.

Nine days after the date of the Settlement Agreement, the Venaglias entered into an

agreement to sell the Property to Suzanne Dutcher for $425,000, an agreement that was consummated by a real estate contract dated November 28, 1994. The $425,000 sum would apparently have been more than enough to pay off all the principal and interest that DBC owed on the Real Estate Contract and the Promissory Note.

(5) On March 31, 1995 Kropinak moved to set aside the August 1994 stipulated judgment against him on his guarantee. He contended that he had never retained the attorney who purportedly represented him in the proceedings. After a hearing the district court granted the requested relief.

(6) Once the judgment against him was set aside, Kropinak filed an answer to the claim, the parties conducted discovery, and Kropinak and the Venaglias each filed motions for summary judgment. The motions for summary judgment focused on the validity of defenses raised by Kropinak. On July 3, 1996 the district court granted summary judgment to Kropinak, ruling that all his defenses were meritorious.

(7) We disagree with that ruling. Most of Kropinak's defenses fail as a matter of law. And the one defense with possible legal merit did not entitle him to summary judgment; issues of fact remain with respect to the extent, if any, to which that defense entitles him to relief.

(8) Kropinak's potentially meritorious defense is his claim that he is fully discharged from his guarantee because the Settlement Agreement between the Venaglias and DBC prejudiced his rights as a guarantor. The gist of his assertion of prejudice is as follows: Although the Settlement Agreement explicitly states that "DBC acknowledges that it has 'equity' in the [P]roperty," DBC relinquished all its rights in the Property to the Venaglias. This left DBC with no assets whatsoever. Thus, if Kropinak were to pay off the Promissory Note in accordance with his guaranty, he would not be able to obtain any reimbursement from DBC. The unfairness of this result is apparent from the fact that a few days after execution of the Settlement Agreement, the Venaglias entered into a contract to sell the Property for a sum that exceeded what DBC owed on the Real Estate Contract and the Promissory Note. In other words, one could say that DBC's "equity" in the Property prior to the Settlement Agreement (the value of the Property less the amount owed on the Real Estate Contract) exceeded the amount owed on the Promissory Note. Hence, if DBC had obtained full value for its interest in the Property, it could have paid off the note guaranteed by Kropinak.

(9) We hold that this defense finds support in Section 44 of the recently adopted Restatement (Third) of Suretyship and Guaranty (1996) (the Restatement), which states that a guarantor is discharged to the extent that the payee impairs the guarantor's recourse against the payor. Rather than citing to the just-published Restatement, however, Kropinak attempted in district court to fit the above argument into more familiar legal pigeonholes. He contended: (1) Pursuant to NMSA 1978, Section 55–3–605(b)(1992), Kropinak was discharged because the Settlement Agreement destroyed his right of recourse against DBC, whose only asset was its interest in the Property. (2) Under the common law of guarantees, the Venaglias' release of DBC discharged Kropinak from his obligation as a guarantor. (3) The Venaglias are not entitled to recover against Kropinak because they did not suffer any damages from the default on the Promissory Note, when one considers the payments made on the Real Estate Contract, the payments on the note, and the proceeds of the Dutcher sale. (4) Kropinak's guaranty was discharged under Section 55–3–605(d) because the release of DBC materially modified his obligation as guarantor.

(10) In the remainder of the opinion we first explain why we reject these four contentions. We then discuss Section 44 and explain why it is not preempted in this case by the provisions of the Uniform Commercial Code governing negotiable instruments. Applying Section 44, we hold that the present record will not support summary judgment for either party.

## II. DISCUSSION

■ (11) There are two principal sources of law governing the rights and duties of the

parties with respect to a guarantee of a promissory note. One is Article 3 of the Uniform Commercial Code, codified in New Mexico at NMSA 1978, Sections 55-3-101 to -605 (1992). (In the New Mexico statutes the numbering is identical to that in Article 3 of the UCC, except that the New Mexico chapter number—55—precedes the UCC number.)

■ (12) The other is the common law. For authoritative guidance on the common law we look to the Restatement. Our notice for oral argument in this case advised counsel to be prepared to discuss the applicability of the provisions of the Restatement to the facts presented here.

■ (13) To begin our analysis, we observe that Kropinak is an accommodation party with respect to the Promissory Note. As stated in Section 55-3-419(a):

> If an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party") and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument, the instrument is signed by the accommodation party "for accommodation".

Section 55-3-419(c) states in pertinent part:

> A person signing an instrument is presumed to be an accommodation party and there is notice that the instrument is signed for accommodation if the signature ... is accompanied by words indicating that the signer is acting as surety or guarantor with respect to the obligation of another party to the instrument.

Kropinak meets the definition of Section 55-3-419(a) because it is undisputed that Kropinak signed the Promissory Note, that the purpose of the note was to enable DBC (the promisor on the note) to enter into the Real Estate Contract with the Venaglias, and that Kropinak did not benefit directly from the transaction, *see* § 55-3-419 official cmt. 1 (employee or shareholder of corporation is "indirect" beneficiary of loan to corporation). Also, the presumption of Section 55-3-419(c) applies because Kropinak's signature appears under the heading "GUARANTORS (individually)." It is worth noting that if the guarantee signed by Kropinak had been a document separate from the Promissory Note, then Kropinak would not have been an accommodation party because he would not have been a "party to the instrument" and he would not have "sign[ed] the instrument." In that event Article 3 would not apply, and the suretyship relationship would be governed by the common law. *See* Restatement § 4, cmt. a; Unif. Comm.Code § 3-419 official cmt. 3, 2 U.L.A. 41-42 (Supp.1997); *FDIC v. Nobles,* 901 F.2d 477, 480 (5th Cir.1990) (applying earlier version of Article 3); *see generally* Neil B. Cohen, *Suretyship Principles in the New Article 3: Clarifications and Substantive Changes,* 42 Ala. L.Rev. 595 (1991).

(14) To recognize that Kropinak is an accommodation party under Article 3 of the UCC is not, however, to say that the common law (and hence the Restatement) is of no interest. The UCC itself states:

> Unless displaced by the particular provisions of this act [the New Mexico UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause, shall supplement its provisions.

NMSA 1978, § 55-1-103 (1961). More directly in point, specific relevant sections of Article 3 explicitly incorporate, at least in part, the common law with respect to contract defenses. *See* § 55-3-305(a)(2) (obligation to pay negotiable instrument may be subject to defenses available with respect to obligation to pay under a simple contract); § 55-3-601(a) (obligation to pay negotiable instrument may be discharged by act or agreement that would discharge obligation to pay under a simple contract). As we shall see, some aspects of the common law of suretyship are not superseded by Article 3 and may provide relief to Kropinak.

(15) We now turn to Kropinak's proffered defenses.

## A. Kropinak Was Not Discharged Under Section 55-3-605(b).

■ (16) Section 55-3-605[1] addresses the discharge of accommodation parties. Subsection b states:

> Discharge ... of the obligation of a party to pay an instrument does not discharge the obligation of an ... accommodation party having a right of recourse against the discharged party.

(17) Relying on this language, Kropinak argues essentially as follows: (1) By saying that discharge of another party does not discharge an accommodation party *who has a right of recourse* against the discharged party, the statute implies that the accommodation party *is* discharged if the accommodation party does not have a right of recourse against the discharged party. (2) Kropinak has no right of recourse against DBC because DBC no longer has any assets; its sole asset was an interest in the Property, and DBC relinquished that interest to the Venaglias in the Settlement Agreement. (3) Therefore, the discharge of DBC also discharges Kropinak.

(18) We reject this argument. The second premise in the syllogism is flawed; Kro-

---

1. The text of the section is as follows:

   (a) In this section, the term "indorser" includes a drawer having the obligation described in Section 55-3-414(d) NMSA 1978.

   (b) Discharge, under Section 55-3-604 NMSA 1978, of the obligation of a party to pay an instrument does not discharge the obligation of an indorser or accommodation party having a right of recourse against the discharged party.

   (c) If a person entitled to enforce an instrument agrees, with or without consideration, to an extension of the due date of the obligation of a party to pay the instrument, the extension discharges an indorser or accommodation party having a right of recourse against the party whose obligation is extended to the extent the indorser or accommodation party proves that the extension caused loss to the indorser or accommodation party with respect to the right of recourse.

   (d) If a person entitled to enforce an instrument agrees, with or without consideration, to a material modification of the obligation of a party other than an extension of the due date, the modification discharges the obligation of an indorser or accommodation party having a right of recourse against the person whose obligation is modified to the extent the modification causes loss to the indorser or accommodation party with respect to the right of recourse. The loss suffered by the indorser or accommodation party as a result of the modification is equal to the amount of the right of recourse unless the person enforcing the instrument proves that no loss was caused by the modification or that the loss caused by the modification was an amount less than the amount of the right of recourse.

   (e) If the obligation of a party to pay an instrument is secured by an interest in collateral and a person entitled to enforce the instrument impairs the value of the interest in collateral, the obligation of an indorser or accommodation party having a right of recourse against the obligor is discharged to the extent of the impairment. The value of an interest in collateral is impaired to the extent (i) the value of the interest is reduced to an amount less than the amount of the right of recourse of the party asserting discharge, or (ii) the reduction in value of the interest causes an increase in the amount by which the amount of the right of recourse exceeds the value of the interest. The burden of proving impairment is on the party asserting discharge.

   (f) If the obligation of a party is secured by an interest in collateral not provided by an accommodation party and a person entitled to enforce the instrument impairs the value of the interest in collateral, the obligation of any party who is jointly and severally liable with respect to the secured obligation is discharged to the extent the impairment causes the party asserting discharge to pay more than that party would have been obliged to pay, taking into account rights of contribution, if impairment had not occurred. If the party asserting discharge is an accommodation party not entitled to discharge under Subsection (e), the party is deemed to have a right to contribution based on joint and several liability rather than a right to reimbursement. The burden of proving impairment is on the party asserting discharge.

   (g) Under Subsection (e) or (f), impairing value of an interest in collateral includes (i) failure to obtain or maintain perfection or recordation of the interest in collateral, (ii) release of collateral without substitution of collateral of equal value, (iii) failure to perform a duty to preserve the value of collateral owed, under Article 9 or other law, to a debtor or surety or other person secondarily liable, or (iv) failure to comply with applicable law in disposing of collateral.

   (h) An accommodation party is not discharged under Subsection (c), (d), or (e) unless the person entitled to enforce the instrument knows of the accommodation or has notice under Section 55-3-419(c) NMSA 1978 that the instrument was signed for accommodation.

   (i) A party is not discharged under this section if (i) the party asserting discharge consents to the event or conduct that is the basis of the discharge, or (ii) the instrument or a separate agreement of the party provides for waiver of discharge under this section either specifically or by general language indicating that parties waive defenses based on suretyship or impairment of collateral.

pinak does have a right of recourse against DBC. (We therefore need not determine the validity of the first premise.) Kropinak fails to distinguish between (a) the right of recourse against a party and (b) the economic value of that right. One can have a right of recourse against a destitute person. The right may not be worth anything, but it exists.

(19) Here, Kropinak has a right of recourse against DBC to the extent that he makes payment on the Promissory Note. This right of recourse is explicitly provided by Article 3 of the UCC. Section 55–3–419(e) states:

> An accommodation party who pays the instrument is entitled to reimbursement from the accommodated party and is entitled to enforce the instrument against the accommodated party. An accommodated party who pays the instrument has no right of recourse against, and is not entitled to contribution from, an accommodation party.

(20) Although in some, perhaps most, contexts a "worthless" right should be treated as no right at all, such treatment is inappropriate when dealing with accommodation parties. After all, the purpose of procuring an accommodation party is to have a source of payment if the accommodated party is unable to pay in full. For example, Section 55–3–305(d) provides that an accommodation party can assert against the payee any defense that the accommodated party could assert "except the defenses of *discharge in insolvency proceedings,* infancy, and lack of legal capacity." (Emphasis added.) When the accommodated party cannot pay in full, the promisee should be able to collect everything possible from the accommodated party and then proceed against the accommodation party. Collecting from the accommodated party can often be facilitated by the promisee's release of the accommodated party in return for the accommodated party's paying what it can. In general, the accommodation party should have no complaints about such a settlement agreement between the promisee and the accommodated party because it knew that the promisee would look to it if the accommodated party encountered financial difficulty. The accommodation party should not be entitled to relief on the ground that the accommodated party has no assets from which the accommodation party can obtain recourse, because it is precisely the potential of such financial straits of the accommodated party that created the utility of having the accommodation party guarantee the note.

(21) The history of Section 55–3–605(b) makes clear its application in the present circumstances. Under the previous version of Article 3, the promisee could release the accommodated party without releasing the accommodation party only if it obtained the consent of the accommodation party or expressly reserved its rights against the accommodation party when it released the accommodated party. *See* NMSA 1978, § 55–3–606(1)(a) (1961). As stated in official comment 3 to Section 55–3–605, the current version of Article 3 abolishes the reservation-of-rights doctrine. The comment explains:

> As a practical matter, Bank [the promisee] will not gratuitously release Borrower [the accommodated party]. Discharge of Borrower normally would be part of a settlement with Borrower if Borrower is insolvent or in financial difficulty. If Borrower is unable to pay all creditors, it may be prudent for Bank to take partial payment, but Borrower will normally insist on a release of the obligation. If Bank takes $3,000 and releases Borrower from the $10,000 debt, Accommodation Party is not injured. To the extent of the payment Accommodation Party's obligation to Bank is reduced. The release of Borrower by Bank does not affect the right of Accommodation Party to obtain reimbursement from Borrower if Accommodation Party pays Bank. Section 3–419(e). Subsection (b) is designed to allow a creditor to settle with the principal debtor without risk of losing rights against sureties. Settlement is in the interest of sureties as well as the creditor. Subsection (b) changes the law stated in former Section 3–606 [repealed] but the change relates largely to formalities rather than substance. Under former Section 3–606 [repealed], Bank could settle with and release Borrower without releasing Accommodation Party, but to accom-

plish that result Bank had to either obtain the consent of Accommodation Party or make an express reservation of rights against Accommodation Party at the time it released Borrower. The reservation of rights was made in the agreement between Bank and Borrower by which the release of Borrower was made. There was no requirement in former Section 3–606 [repealed] that any notice be given to Accommodation Party. The reservation of rights doctrine is abolished in Section 3–605 [55–3–605 NMSA 1978] with respect to rights on instruments.

A recent revision to Section 3–305 official comment 5 (which does not appear in New Mexico Statutes Annotated) reinforces our conclusion:

> As explained in Comment 3 to Section 3–605, discharge of the accommodated party is normally part of a settlement under which the holder of a note accepts partial payment from an accommodated party who is financially unable to pay the entire amount of the note. If the holder then brings an action against the accommodation party to recover the remaining unpaid amount of the note, the accommodation party cannot use Section 3–305(d) to nullify Section 3–605(b) by asserting the discharge of the accommodated party as a defense.

2 U.L.A., *supra*, at 21.[2]

▪ (22) In short, Section 55–3–605(b) is not intended to protect an accommodation party from a settlement in which the promisee discharges the accommodated party in return for paying all that it can on the note. The accommodation party should expect to be obligated to pay to the extent that the accommodated party does not have the resources to pay. (We note, however, that aspects of the settlement agreement other than the release of the accommodated party may provide a source of relief to the accommodation party. That issue will be addressed in the discussion below of Restatement Section 44.)

---

**2.** The comment adds, however, that the accommodation party may be discharged if the discharge of the accommodated party is really an accord and satisfaction, as when the promisee and the accommodated party settle competing

### B. The Common Law of Guarantees.

(23) We can dispose summarily of Kropinak's contention based on the common law of guarantees. He contends that "[i]t is well-settled law that the release of a principal debtor of his obligation on a note discharges the obligation owed to the creditor by an accommodation party." Even assuming that Kropinak fully expresses the common law, *but see* Restatement § 39, the UCC governs. The common-law proposition advanced by Kropinak states a rule directly contrary to Section 55–3–605(b), as discussed above. Accordingly, the common-law rule is "displaced by the particular provisions of [the UCC]." Section 55–1–103. *See Ponderosa Paint Mfg. v. Yack*, 125 Idaho 310, 870 P.2d 663, 667–68 n. 4 (Idaho Ct.App.1994); Restatement § 4(1) ("To the extent that a transaction resulting in a person having suretyship status is governed by the law of negotiable instruments ..., that law takes precedence over otherwise applicable rules in this Restatement."); *id.* illus. 1.

### C. Full Payment of the Debt.

▪ (24) Kropinak contends that the Venaglias are not owed any more money, because they have recovered the full purchase price of the Property—from the down payment, payments on the Real Estate Contract, payments on the Promissory Note, and the amount cleared on the resale of the property to Dutcher. We reject the contention. We agree with the Venaglias that Kropinak is proposing to treat a real estate contract as an equitable mortgage, a contention rejected by the New Mexico Supreme Court in *Bishop v. Beecher*, 67 N.M. 339, 341–42, 355 P.2d 277, 278–79 (1960); *see First Nat'l Bank v. Cape*, 100 N.M. 525, 527–28, 673 P.2d 502, 504–05 (1983). When a mortgagee forecloses on a mortgage securing a debt, the mortgagee is not entitled to retain proceeds of the foreclosure sale beyond the expenses of the sale and the amount owed pursuant to the

---

claims against one another; for example, when the promissory note is in payment of allegedly defective goods. *See* 2 U.L.A., *supra*, at 21. Kropinak does not argue accord and satisfaction here.

note and mortgage; the mortgagor has a right to its equity in the property. *See* 4 Richard R. Powell, *Powell on Real Property* ¶ 467, at 320–21 (Patrick J. Rohan rev. ed.1993); *Edwards v. Clovis Nat'l Bank,* 18 N.M. 424, 137 P. 582 (1913). But when a seller of property under a real estate contract takes back the property after the purchaser's default, the seller has no duty to account to the purchaser for any "profit" made from the transaction, absent extraordinary circumstances, such as a forfeiture that shocks the court's conscience. *See Huckins v. Ritter,* 99 N.M. 560, 661 P.2d 52 (1983) (purchaser's down payment of $45,000 was almost one-third of purchase price of house, and purchaser occupied house less than seven months; purchaser entitled to partial return of down payment). Parties entering into a real estate contract understand that their rights and duties are not the same as those pursuant to a note and mortgage, and they decide on the form of the transaction for their own business reasons. *See Bishop,* 67 N.M. at 342, 355 P.2d at 279. The purchaser knows that it can forfeit its "equity" in the property in the event of default. (A surety of the purchaser, however, may be entitled to some protection against such a forfeiture. As will appear from our discussion of Restatement Section 44, the suretyship obligation may be discharged to the extent of the forfeiture.)

### D. Material Modification Under Section 55–3–605(d).

■ (25) Kropinak's fourth defense is that he is discharged under Section 55–3–605(d) because of a material modification to his obligation. Section 55–3–605(d) states:

> If a person entitled to enforce an instrument agrees, with or without consideration, to a material modification of the obligation of a party other than an extension of the due date [which is addressed in Section 55–3–605(c)], the modification discharges the obligation of an indorser or accommodation party having a right of recourse against the person whose obligation is modified to the extent the modification causes loss to the indorser or accommodation party with respect to the right of recourse. The loss suffered by the indor-

ser or accommodation party as a result of the modification is equal to the amount of the right of recourse unless the person enforcing the instrument proves that no loss was caused by the modification or that the loss caused by the modification was an amount less than the amount of the right of recourse.

Kropinak contends that his obligation was modified by the Settlement Agreement because the agreement provided for DBC to deliver to the Venaglias its only asset, the Property, and abandon all claims with respect to the Property. As a result, Kropinak would not be able to recover any reimbursement from DBC.

(26) In our view, however, Kropinak interprets "the obligation of a party" too broadly. The obligation referred to in Section 55–3–605(d) is the set of duties of the principal obligor set forth in the instrument itself. *See* § 55–3–605 official cmt. 5. The primary duties would be to make certain payments at certain dates. Typical material modifications would be increases in the amount due or in the interest rate, or changes in covenants binding the obligor (such as restrictions on incurring other debt). *See* UCC § 3–605 rev. official cmt. 5, 2 U.L.A., *supra,* at 51–52; *cf.* Restatement § 41 (addressing material modifications of underlying obligation in general suretyship context).

(27) Here, the only instrument on which Kropinak was obligated was the Promissory Note. There was no change in the terms set forth in the note, except for the discharge of DBC, which is governed by Section 55–3–605(b), as discussed above. To be sure, Kropinak's exposure—his risk of loss—may have increased as a result of the Settlement Agreement, but his obligation remained the same. We observe that Section 55–3–605(e) specifically addresses increases in exposure resulting from impairment of collateral. If Section 55–3–605(d) intended "modification of the obligation" to encompass increases in exposure under the obligation, we would expect it to contain a cross-reference to Section 55–3–605(e), so that the beginning of Section 55–3–605(d) would read: "If a person entitled

to enforce an instrument agrees ... to a material modification of the obligation of a party other than an extension of the due date *or an impairment of collateral* ...." We conclude that here there was no "material modification of the obligation" within the meaning of Section 55–3–605(d).

### E. Impairment of Recourse.

(28) Although we reject Kropinak's contention that he is entitled to relief under Section 55–3–605(d), his argument in support of that contention captures a common-law defense that may assist him. His answer brief states:

> The [Settlement Agreement] directly caused a loss to Mr. Kropinak in his right of recourse against DBC, which owned no assets of value after execution of the [Settlement Agreement].... Because DBC waived all rights and claims to the Property and delivered possession of the Property back to [the Venaglias], along with all the accrued equity in the Property, Mr. Kropinak cannot obtain payment from DBC. Thus, the unauthorized modification has effectively caused the loss of Mr. Kropinak's right of recourse against DBC.

We have already explained our rejection of the contentions that there was a modification of the obligation and that Kropinak was deprived of his right of recourse, but the real thrust of what he is saying is that his right of recourse was impaired by the Settlement Agreement. The essence of Kropinak's argument is that the manner in which the Venaglias dealt with DBC eliminated his ability to obtain any reimbursement from DBC as the accommodated party. One might infer from the price at which Dutcher purchased the Property from the Venaglias that DBC had a significant equity interest in the Property when DBC relinquished its interest and claims with respect to the Property to the Venaglias shortly before the Dutcher transaction. If so, Kropinak may have been able to use that equity to obtain reimbursement from DBC for whatever Kropinak had to pay on his guarantee to the Venaglias.

(29) Restatement Section 44, entitled "Other Impairment of Recourse," states:

> If ... the obligee impairs ... the principal obligor's duty to reimburse ..., or the secondary obligor's right of restitution ... or subrogation ..., the secondary obligor is discharged from its duties pursuant to the secondary obligation to the extent that such impairment would otherwise cause the secondary obligor a loss.

In other words, if the Venaglias impaired DBC's ability to repay Kropinak for whatever Kropinak had to pay on his guarantee to the Venaglias, Kropinak is discharged to that extent on his guarantee. We adopt this provision of the Restatement. Although the case law on the general subject of impairment of recourse appears to be limited almost entirely to discharges based on actions that are addressed in other specific sections of the Restatement—release of the underlying obligation (Section 39), extensions of time (Section 40), modification of the underlying obligation (Section 41), impairment of collateral (Section 42), and delay in enforcement (Section 43)—the proposition set forth in Section 44 captures the principle underlying the more-specific propositions set forth in those sections. Section 44 can be viewed as the general proposition exemplified by the preceding sections or as a catch-all. *See Annual Meeting The American Law Institute,* 70 A.L.I. Proc. 179 (1993) (Reporter for Restatement describes draft section later numbered as Section 44 as "residual clause" that "recognizes that ... one cannot think of all the possible ways that the obligee and the principal obligor could get together to impair the recourse of the secondary obligor"); Peter A. Alces, *The Law of Suretyship and Guaranty* § 7.03 (1996). Either way, we find Section 44 to be sound policy, firmly grounded in common-law traditions reflected in other sections of the Restatement. At oral argument Kropinak relied in part on Section 44.

(30) There remains the question, however, whether Restatement Section 44 applies to an accommodation party on a negotiable instrument. In other words, does Article 3 of the UCC preclude this defense?

(31) We think not. Two provisions of Article 3 indicate that common-law defenses not specifically excluded by the article are

available to an obligor on a negotiable instrument. Section 55–3–305(a)(2) states:

> Except as stated in Subsection (b) [relating to holders in due course], the right to enforce the obligation of a party to pay an instrument is subject to the following:
>
> . . . .
>
> (2) a defense of the obligor stated in another section of this article or *a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract* . . . .

(Emphasis added.) In other words, an obligor has a defense (except to holders in due course) on a negotiable instrument if the defense would be available with respect to a contract (other than a negotiable instrument) to pay money. *Cf.* Ellen A. Peters, *Suretyship Under Article 3 of the Uniform Commercial Code*, 77 Yale L.J. 833, 875 n. 167 (1968) (former UCC § 3–306(c) [Section 55–3–306(c) (1961)] leaves a role to the common law of the individual states in determining what suretyship defenses bind holders who are not holders in due course).

(32) Similarly, Section 55–3–601 states:

> (a) *The obligation of a party to pay the instrument is discharged* as stated in this article or *by an act or agreement with the party which would discharge an obligation to pay money under a simple contract.*
>
> (b) Discharge of the obligation of a party is not effective against a person acquiring rights of a holder in due course of the instrument without notice of the discharge.

(Emphasis added.) A straightforward reading of Section 55–3–601(a) is that Article 3—which includes Section 55–3–605—does not set forth the only grounds on which accommodation parties can be discharged from their obligation to pay on an instrument. To be sure, Section 55–3–605 would prevail over any conflicting common law; for example, Subsection (b) of Section 55–3–605 would override otherwise applicable common law regarding the obligation of an accommodation party when the accommodated party is discharged, and Subsections (c), (d), and (e) may modify common-law burdens of persuasion and the extent of the discharge resulting from extension of a due date, modification to

the obligation, or impairment of the value of collateral. *See* Restatement §§ 39, 40, 41, 42. But Section 55–3–605 does not on its face, particularly in light of Section 55–3–601, preclude additional defenses that do not contradict the terms of Section 55–3–605. Thus, it would appear that Kropinak's obligation to the Venaglias (who are not holders in due course) could be discharged by the common-law contract defense set forth in Restatement Section 44.

(33) A fourth section of Article 3, however, gives us pause. Section 55–3–419(c), which has already been quoted in part, states in full:

> A person signing an instrument is presumed to be an accommodation party and there is notice that the instrument is signed for accommodation if the signature is an anomalous indorsement or is accompanied by words indicating that the signer is acting as surety or guarantor with respect to the obligation of another party to the instrument. Except as provided in Section 55–3–605 NMSA 1978, the obligation of an accommodation party to pay the instrument is not affected by the fact that the person enforcing the obligation had notice when the instrument was taken by that person that the accommodation party signed the instrument for accommodation.

What is the effect of the second sentence of this subsection? One could read it as saying that Section 55–3–605 provides the exclusive grounds upon which an accommodation party may be discharged. One could reason as follows: (1) An accommodation party who signs a promissory note is liable as a maker if the obligee has no notice that the accommodation party has signed the note in that capacity; in other words, an accommodation party has no suretyship defense unless the obligee has notice. (2) Under the second sentence of Section 55–3–419(c), the fact that the obligee is on notice that the signer is an accommodation party has no effect other than what is provided in Section 55–3–605.(3) Therefore, any purported suretyship defense not set forth in Section 55–3–605 must be unavailable.

(34) Nevertheless, we hold that Section 55–3–419(c) does not limit suretyship defenses to those set forth in Section 55–3–605. Several considerations lead us to this conclusion. First, the language of Section 55–3–419(c) would be a rather obtuse way of stating the relatively straightforward proposition that Section 55–3–605 provides the exclusive grounds of discharge for accommodation parties. If such were the drafters' intent, one would expect a less circuitous expression of the proposition.

(35) Second, Section 55–3–419(c) states that "notice" does not affect the accommodation party's obligation except as stated in Section 55–3–605. It says nothing about available defenses when there is not just notice, but actual knowledge. Significantly, Section 55–3–605 distinguishes between "notice" and "knowledge." Section 55–3–605(h) states:

> An accommodation party is not discharged under Subsection (c), (d), or (e) unless the person entitled to enforce the instrument *knows* of the accommodation *or has notice under Section 55–3–419(c)* NMSA 1978 that the instrument was signed for accommodation.

(Emphasis added.) One can infer that Section 55–3–419(c) does not restrict discharges requiring *knowledge* of the promisee to those set forth in Section 55–3–605. Section 55–3–605 would thus be the exclusive source for discharge only to the extent that notice alone is a sufficient predicate for the discharge.

■ (36) Third, we must keep in mind the purposes of Article 3.[3] Its chief purpose is greasing the wheels of commerce by establishing clear, practical rules governing negotiable instruments, so that subsequent parties (after the negotiation) know their rights. *See* Peters, *supra*, at 861–79. Article 3 advances the "policies of unclogged negotiability and inquiry-free transfer [of negotiable

paper]." *Id.* at 877. Although Article 3 says much that also governs the relationship between the original parties, we should not presume that the Uniform Commercial Code attempts to occupy that field to the exclusion of the common law. *See* § 55–3–103. Consequently, we are unwilling to infer from the oblique language of Section 55–3–419(c) that the only suretyship defenses that can be raised against the original promisee are those set forth in Section 55–3–605. Recognition here of the suretyship defense set forth in Restatement Section 44 should not impede transactions in negotiable instruments. We note that holders in due course are not bound by defenses or discharges of which they lack knowledge. *See* § 55–3–305(b), § 55–3–601(b). We need not address what suretyship defenses might be available against subsequent holders who are not holders in due course.

■ (37) In sum, we conclude that Kropinak may be entitled to relief, in whole or in part, from his obligation on his guarantee if the Settlement Agreement between DBC and the Venaglias impaired his right of recourse against DBC. Whether such impairment occurred, however, is an unresolved issue of fact. Although the sale price for the Property in the real estate contract between the Venaglias and Dutcher is evidence that the Settlement Agreement between the Venaglias and DBC impaired Kropinak's right of recourse, it is hardly conclusive. The practicalities of the situation were not addressed in the district court, primarily because each side adopted an all-or-nothing position. Kropinak contended in essence that any impairment would provide him with a complete discharge, whereas the Venaglias argued that there was no basis at all for a discharge. On remand the district court will need to determine precisely what was owed under the Real Estate Contract and how much, if at all,

---

**3.** We also note, but do not rely on, another consideration that could support our conclusion. Section 55–3–305 may not be restricted by Section 55–3–605 in the same manner that Section 55–3–601 is. Section 55–3–305 permits "defenses" available to a party to a simple contract, whereas Section 55–3–601 and 55–3–605 speak in terms of "discharge" of an obligation. Professor (later Justice) Peters suggested that there is a difference between a discharge and other defenses. *See* Peters, *supra*, at 874–75; William D. Hawkland, *Commercial Paper* 132 (2d ed. 1979) ("[A] discharge clearly is only a personal defense that is cut off by a holder in due course."). Consequently, perhaps a suretyship *defense* under common law may be recognized between the original parties even though Article 3 establishes the exclusive grounds for a *discharge*.

the Settlement Agreement in fact prejudiced Kropinak.

## III. CONCLUSION

(37) We hold that the district court erred in granting Kropinak summary judgment. Additionally, we conclude that the existence of material factual issues precludes the award of summary judgment to the Venaglias. We remand for further proceedings consistent with this opinion.

(38) IT IS SO ORDERED.

DONNELLY and WECHSLER, JJ., concur.

