2005-NMCA-046
110 P.3d 1080

**WXI/Z SOUTHWEST MALLS Real Estate Liability Company, Plaintiff–Appellant,**

v.

**Frank MUELLER, Renee Mueller, and Aspen Ventures Accord, Inc., Defendants,**

and

**C.W. and Margaret Ritter, Defendants–Appellees.**

No. 24,492.

Court of Appeals of New Mexico.

Feb. 9, 2005.

Certiorari Denied, No. 29,149, April 20, 2005.

William R. Keleher, Mark J. Fidel, Mary T. Torres, Modrall, Sperling, Roehl, Harris & Sisk, P.A. Albuquerque, NM, for Appellant.

Matthew P. Holt, Holt & Babington, P.C., Las Cruces, NM, for Appellees.

## OPINION

FRY, Judge.

{1} WXI/Z Southwest Malls Real Estate Liability Company (Southwest Malls) appeals from an order denying summary judgment against Defendants C.W. and Margaret Ritter (the Ritters) for unpaid rent and other tenant charges that it claims amount to over $200,000. The Ritters, who were assignors of a lease and guarantors of the rent, claim they were entitled to prompt notice from Southwest Malls that an assignee was failing to pay rent. The Ritters also claim that Southwest Malls breached the implied covenant of good faith and fair dealing in the guaranty by failing to provide such notice. For the reasons that follow, we hold that Southwest Malls had no express or implied duty under the guaranty to provide notice of the default prior to filing suit against the Ritters. We also hold that in such an arms-length, commercial transaction, the Ritters have failed to raise genuine issues of material fact as to any breach by Southwest Malls of the implied covenant of good faith and fair dealing. Both holdings are informed by the "long-standing backdrop of New Mexico law enforcing contractual obligations as they are written" and the public interest in ensuring that private parties are secure in the knowledge that their contracts will be enforced. *United Props. Ltd. v. Walgreen Props., Inc.*, 2003–NMCA–140, ¶¶ 12, 10, 134 N.M. 725, 82 P.3d 535.

## BACKGROUND

{2} The Ritters leased commercial space in a shopping mall, in which they operated a tavern. The lease period was for slightly more than ten years. Rent and various operating expenses shared by mall tenants were due monthly. Eight years into the lease, the Ritters sought to assign the lease to Frank and Renee Mueller (the Muellers), who would continue to operate the tavern. Southwest Malls, which became the landlord in 1999, consented to the assignment on the condition that the Ritters would continue to be liable for rent and would guarantee the

lease. The Ritters signed the document and were listed as "assignor and guarantor." The assignment contained the following clause:

5. Continuing Liability. Landlord's consent to the Assignment is granted subject to Assignor remaining primarily liable on the lease, and Assignor, as a Guarantor (jointly and severally) under the Lease, hereby acknowledges such continuing liability to Landlord.

{3} Two months later, the Muellers assigned the lease to Aspen Ventures Accord, Inc. (Aspen), in which they had an interest. Southwest Malls again consented to the assignment, but on the condition that both the Ritters and Muellers remained liable on the lease as guarantors. The Ritters signed the assignment and were listed as "guarantors." The document contained this language:

5. Continuing Liability. Landlord's consent to the Assignment is granted subject to Assignor and all Guarantors of the Lease, if any, remaining primarily liable on the lease, and Assignor and all Guarantors, if any, hereby acknowledge the continuing liability of Assignor and Guarantors to Landlord under the Lease.

{4} Aspen failed to pay rent starting in August 2000. Southwest Malls apparently took no action to evict Aspen or terminate the lease, and Aspen did not surrender the premises. During the time that rent was going unpaid, a division of Southwest Malls was in contact with the Ritters regarding a separate dispute about monies owed prior to the assignment to the Muellers. Southwest Malls did not notify the Ritters about Aspen's default until April 2002, nearly two years after Aspen stopped paying rent, when it sued all three parties (the Ritters, the Muellers, and Aspen) for the unpaid rent and other charges. After the suit was filed, Aspen and the Muellers were both discharged in bankruptcy proceedings, and the trustee for Aspen reported that no assets remained for distribution. Thus, Southwest Malls seeks the full amount owing plus attorney fees from the Ritters under the lease, the assignments, and, in particular, the two guaranty agreements.

{5} The Ritters defend on the grounds that Southwest Malls had a duty under the guaranty contract to timely notify them of Aspen's default, and that its unjustified delay in doing so both violated the covenant of good faith and fair dealing and allowed damages to pile up. The Ritters contend that had Southwest Malls simply informed them of the situation, they could have applied their extensive experience as restauranteurs either to operate the tavern themselves or locate new, paying tenants. In either case, the Ritters argue that they could have prevented the unpaid rent from growing to the amounts claimed by Southwest Malls.

{6} Southwest Malls moved for summary judgment, which the district court denied. The district court found that the Ritters did guarantee the payment of rent, but that there were two issues of material fact impacting the question of whether Southwest Malls breached the implied covenant of good faith and fair dealing: (1) whether a creditor like Southwest Malls owes a guarantor, like the Ritters, any notice that the principal obligor (Aspen) is in default on the underlying obligation, particularly where periodic payments are due; and (2) the failure by Southwest Malls to provide notice of Aspen's default, in the context of the ongoing communications with the Ritters, and the purported resulting harm to the Ritters.

{7} The district court issued an order authorizing interlocutory appeal, stating that the case involved controlling questions of law for which there are substantial grounds for difference of opinion and that an immediate appeal would advance the ultimate termination of the litigation. This Court granted the request for a permissive interlocutory appeal pursuant to NMSA 1978, § 39–3–4 (1999) and Rule 12–203(A) NMRA.

## DISCUSSION

### Standard of Review

■ {8} We review denials of summary judgment de novo because the issue on appeal is a question of law. *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

*Id.* We consider any facts presented in the light most "favorable to support a trial on the issues because the purpose of summary judgment is not to preclude a trial on the merits if a triable issue of fact exists." *Madsen v. Scott*, 1999–NMSC–042, ¶ 7, 128 N.M. 255, 992 P.2d 268 (internal quotation marks and citation omitted). "[S]ummary judgment is not appropriate when the facts before the court are insufficiently developed or where further factual resolution is essential for determination of the central legal issues involved." *Brown v. Taylor*, 120 N.M. 302, 307, 901 P.2d 720, 725 (1995) (internal quotation marks and citation omitted). We address in turn each of the concerns that prevented the district court from granting summary judgment to Southwest Malls.

### Duty to Notify Guarantor of Principal's Failure to Pay Monthly Rent

■ {9} The Ritters contend that even though the guaranty agreement did not expressly require any notice of default by the principal, Southwest Malls had a duty to alert them to the default so that they could take action to mitigate damages once Aspen stopped paying rent. This is a novel issue in New Mexico.

■ {10} A guaranty is a contract and we apply all of the general rules regarding the application and construction of contracts. See *Shirley v. Venaglia*, 86 N.M. 721, 724, 527 P.2d 316, 319 (1974) (stating that "[t]he guaranty agreement is a separate, distinct contract"); see also Restatement (Third) of Suretyship and Guaranty § 14 (1996) (stating that standard contract rules apply to secondary obligations). Therefore, we begin with a brief summary of these rules.

■ {11} "When discerning the purpose, meaning, and intent of the parties to a contract, the court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties." *CC Hous. Corp. v. Ryder Truck Rental, Inc.*, 106 N.M. 577, 579, 746 P.2d 1109, 1111 (1987). "Absent ambiguity, provisions of [a] contract need only be applied, rather than construed or

interpreted." *Richardson v. Farmers Ins. Co.,* 112 N.M. 73, 74, 811 P.2d 571, 572 (1991). "Parties to a contract agree to be bound by its provisions and must accept the burdens of the contract along with the benefits. When a contract was freely entered into by parties negotiating at arm's length, the duty of the courts is ordinarily to enforce the terms of the contract which the parties made for themselves." *Nearburg v. Yates Petroleum Corp.,* 1997–NMCA–069, ¶ 31, 123 N.M. 526, 943 P.2d 560 (internal citation omitted). "[C]ourts may not rewrite obligations that the parties have freely bargained for themselves ... [i]n the absence of fraud, unconscionability, or other grossly inequitable conduct." *United Props. Ltd.,* 2003–NMCA–140, ¶ 10, 134 N.M. 725, 82 P.3d 535 (internal quotation marks and citation omitted).

{12} As for the interpretation and application of a guaranty, "[t]he language of the written guaranty agreement governs the rights of the [g]uarantors" and "[t]he parties ... are free to determine for themselves by contract ... the duties and obligations which follow." *Levenson v. Haynes,* 1997–NMCA–020, ¶ 19, 123 N.M. 106, 934 P.2d 300; see *Sunwest Bank v. Garrett,* 113 N.M. 112, 116, 823 P.2d 912, 916 (1992) ("The respective rights of the guarantor and the creditor are determined by reference to the terms of the contract between them."). Generally, a guarantor is entitled to strict construction of the guaranty, cannot be held liable beyond the strict terms or intent of that agreement, and is considered a "favorite of the law". *Shirley,* 86 N.M. at 724, 527 P.2d at 319 (internal quotation marks and citation omitted).

{13} Guaranties are categorized into various types, and for reasons that will become apparent, the Ritters characterize their guaranty as being akin to a continuing or open guaranty. Southwest Malls characterizes the agreement as an absolute guaranty. We agree with Southwest Malls, as did the district court, that the Ritters made an absolute guaranty. We summarize the various guaranties and the rules relating to each and apply those rules to this case.

{14} Generally, the law classifies guaranty agreements as either absolute or conditional. See *Am. Bank of Commerce v. Covolo,* 88 N.M. 405, 409, 540 P.2d 1294, 1298 (1975) (classifying guaranty as unconditional); *Bank of N.M. v. N.W. Power Prods., Inc.,* 95 N.M. 743, 747, 626 P.2d 280, 284 (Ct.App.1980) (classifying guaranty as conditional); *Williams v. Clark,* 417 N.W.2d 247, 251 (Iowa Ct.App.1987) (stating that guaranties are generally classified as either conditional or absolute). See generally 38 Am. Jur.2d Guaranty § 18 (1999) (comparing absolute and conditional guaranties). A guaranty is conditional when its terms state that a condition precedent must be met before the guarantor is held liable; otherwise it is absolute. *Williams,* 417 N.W.2d at 251. The distinction is meaningful here because a guarantor who does not impose conditions on his liability is considered automatically liable upon the default of the principal, and the creditor is neither required to first seek payment from the principal nor to notify the guarantor of any default. *Id.;* see *Pavlantos v. Garoufalis,* 89 F.2d 203, 206 (10th Cir. 1937) ("An absolute guaranty is an unconditional undertaking ... and such a guarantor is liable immediately upon default of the principal without notice."); *W. States Leasing Co. v. Adturn, Inc.,* 31 Colo.App. 256, 500 P.2d 1190, 1191 (1972) (explaining that notice is not required where an unambiguous, absolute guaranty is silent as to notice); *Bowyer v. Clark Equip. Co,* 171 Ind.App. 431, 357 N.E.2d 290, 293 (1976) ("It is well established in Indiana that a guarantor is not entitled to notice of his principal's default when his undertaking ... is absolute."). A guarantor's promise to pay rent is generally viewed as an absolute guaranty. See 49 Am.Jur.2d Landlord and Tenant §§ 816–17 (1995) (stating that a guaranty of payment of rent is absolute, the guarantor is not entitled to notice, and it is the business of the guarantor to see that the principal pays any rent due). Like the district court, we conclude that the Ritters' guaranty was absolute because the plain language imposed no condition precedent upon their liability to pay rent. See *Richardson,* 112 N.M. at 74, 811 P.2d at 572 (explaining that unambiguous contracts need only be applied rather than interpreted). Because the guaranty was absolute and was silent as to notice, Southwest Malls was not

required to provide notice prior to enforcing the guaranty.

{15} Guarantees are also classified as either continuing or restricted. *Gen. Elec. Capital Corp. v. Dodson Aviation, Inc.,* 286 F.Supp.2d 1307, 1313 (D.Kan.2003) (applying Kansas contract law). See generally, 38 Am.Jur.2d Guaranty §§ 20, 22 (1999) (defining continuing and restricted guarantees). A continuing guaranty is one in which a guarantor assumes liability, but the amount of debt or time for payment remains undefined, such as a line of credit. *Levenson,* 1997–NMCA–020, ¶ 23, 123 N.M. 106, 934 P.2d 300 (stating that a "guaranty is continuing if it contemplates future course of dealing during an indefinite period or series of transactions"); *F.D.I.C. v. Moore,* 118 N.M. 77, 78–80, 879 P.2d 78, 79–81 (1994) (noting a guaranty for an unlimited amount was "continuing"); Restatement (Third) of Suretyship and Guaranty § 16 (defining continuing guaranty as one in which guarantor is bound to all future obligations of the debtor and the guarantor may terminate his guaranty as to future debts); see also 49 Am.Jur.2d Landlord and Tenant § 819 (1995) (explaining that a guaranty to pay rent may be a continuing guaranty if the parties intended for it to extend into successive terms). Some courts have described a continuing guaranty as a series of offers that are accepted by the creditor upon the extension of further credit to the debtor. See *Georgia–Pacific Corp. v. Levitz,* 149 Ariz. 120, 716 P.2d 1057, 1059 (Ct.App.1986). On the other hand, a guaranty is restricted if the guaranty contemplates a single transaction or a limited number of transactions. 38 Am.Jur.2d Guaranty §§ 20, 22.

{16} It is well-settled that a creditor must provide notice of a principal's default to a guarantor in the case of a continuing guaranty. *Bowyer,* 357 N.E.2d at 293 (stating that notice was required where debts were unknown and indefinite and no due date was established); 38A C.J.S. Guaranty § 74 (1996) (explaining that a guarantor is only entitled to notice of default "when the guaranty is conditional or uncertain as to amount or accrual"); see also *Davis v. Wells,* 104 U.S. 159, 170, 26 L.Ed. 686 (1881) (holding that in the case of a continuing guaranty, the guarantor could be discharged if the creditor's delay in giving notice caused actual loss to the guarantor). In a continuing guaranty, the guarantor can intervene to stem potentially limitless liability by terminating the guaranty as to future debts, so it naturally follows that the guarantor must be given notice of a default. See Restatement (Third) of Suretyship and Guaranty § 16, cmt. b (stating that a guarantor of a continuing guaranty can terminate the guaranty and thereby terminate liability for any future debts).

{17} The Ritters characterize their guaranty as more like a continuing guaranty because more than a single payment was contemplated, and therefore it was not a "single obligation." They further contend that in such a case the law conditions their liability on notice from the creditor that the principal has defaulted. We reject the contention that this guaranty was similar to a continuing guaranty and conclude that this was a restricted guaranty. Here, the district court found that the Ritters' guaranty was absolute, yet it questioned whether notice still may have been necessary due to the periodic accrual of the obligation to pay rent. The district court's uncertainty was misplaced. An obligation to pay a reasonably ascertainable rent for a fixed period is not a continuing guaranty because both the depth and duration of the liability can be easily ascertained at the outset. *Compare Bowyer,* 357 N.E.2d at 293 (finding that notice was required for a guaranty where "the liabilities guaranteed have not been created and are uncertain in amount"); with *W. States Leasing Co.,* 500 P.2d at 1191 (stating that where "the maximum amount guaranteed is determinable at the time the guarantee is entered into" and the guaranty is absolute, there is no requirement of notice of default).

{18} The Ritters' liability on the ten-year lease was created when it was executed—the underlying obligation to pay rent was not created monthly, but was created when the lease began. The lease was a single ten-year obligation and not a series of obligations or transactions. The guaranties signed by the Ritters involved reasonably certain amounts

for rents and other charges. The Ritters' operation of the tavern under this lease for the prior eight years allowed them to assess the typical monthly rent and other charges and they do not contend otherwise. The guaranty was also of limited duration—the lease terms indicate it terminated on January 1, 2002. The fact that rents and charges were due monthly does not convert the quantifiable and finite liability into an obligation analogous to an unlimited line of credit or an obligation with no end date. Because this was a single obligation, and not an open-ended series of obligations, and because the amount guaranteed was reasonably ascertainable, we conclude that this was a restricted guaranty. See *Richardson*, 112 N.M. at 74, 811 P.2d at 572 (explaining that unambiguous contracts need only be applied rather than interpreted). While the guaranty language in this case says that the Ritters guaranty is "continuing," that refers to the obligation continuing through the term of the lease and is not dispositive of the nature of the obligation.

{19} The conclusion that such a guaranty was for a finite period and sum is bolstered by the rule articulated by our Supreme Court that generally a guarantor is not liable to pay rent forever, even if the guarantor's principal becomes a holdover tenant under holdover terms in a lease. *Shirley*, 86 N.M. at 724–25, 527 P.2d at 319–20 (stating that a guarantor is released after the lease term has expired unless there is some assent by the guarantor or the guaranty expressly contemplates such extension). In this case, the Ritters signed a restricted absolute guaranty and no notice of default was required prior to Southwest Malls acting to enforce the guaranty. While arguably it may have been potentially of some benefit to the Ritters if Southwest Malls had given them notice, there was simply no legal duty to do so.

{20} We note that this is not a case where a creditor and debtor act together to impede a guarantor's right of recourse against the debtor, as when a creditor discharges the principal debtor. Southwest Malls did not discharge Aspen; it sued Aspen, and the Ritters were not prevented from acting against Aspen. See *Venaglia v. Kropinak*, 1998–NMCA–043, ¶¶ 9, 29, 125 N.M. 25, 956 P.2d 824 (adopting the Restatement rule that a guarantor of a negotiable instrument is discharged to the extent that the payee impairs the guarantor's recourse against the payor); see also Restatement (Third) of Suretyship and Guaranty § 44 (stating that guarantor can be discharged if the creditor impairs a guarantor's right of restitution from the principal); Restatement (Third) of Suretyship and Guaranty § 50(1) (stating that a creditor's delay or failure to act against the principal does not discharge the guarantor).

{21} We also decline to impose a general affirmative duty on creditors to provide updates to guarantors during the course of the guaranty. Courts have imposed a duty upon creditors to disclose facts to a guarantor, but this duty is limited to situations where the guaranty agreement is not yet executed, cases of a continuing guaranty, or where the guarantor has reserved a right of termination. See *Alan Stephens, Annotation, Creditor's Duty of Disclosure to Surety or Guarantor After Inception of Suretyship or Guaranty*, 63 A.L.R.4th 678 (1988); Restatement (First) of Security § 124(1) (1941) (describing guarantor's defenses based on a creditor's non-disclosure of facts before the guaranty arises); § 124(2) (imposing on creditor a duty to inform guarantor of facts which would give guarantor a right to terminate the guaranty); Restatement (Third) of Suretyship and Guaranty § 47 (stating that if a creditor fails to disclose events which would give a guarantor the ability to terminate the guaranty, the guarantor is discharged from further liability); see also Me. *Nat'l Bank v. Fontaine*, 456 A.2d 1273, 1275 (Me.1983) (imposing a duty on creditor to disclose facts where guaranty is for a series of credit extensions); *Georgia–Pacific Corp.*, 716 P.2d at 1059 (stating that in a continuing guaranty, a creditor may be required to notify the guarantor where the creditor is aware of facts that increase risk to the guarantor, has reason to think the guarantor is unaware of these facts, and has an opportunity to communicate them prior to further extensions of credit). Here, the guaranty had been executed, it was not a continuing guaranty, and the circumstances known to Southwest Malls

did not give the Ritters a right to terminate the guaranty. Thus, there was simply no duty for Southwest Malls to reach out to the Ritters to keep them apprised of Aspen's performance.

{22} Finally, while the Ritters are correct that a guaranty must be construed strictly so as to not expand their liability, the guaranty here is clear and unambiguous, and there is nothing to construe. We apply the plain terms of the express contract which indicate that if the assignees failed to pay rent, then the Ritters were obligated to do so. Southwest Malls bargained for an absolute guaranty to which the Ritters agreed, and Southwest Malls should get the benefit of that bargain. The Ritters were free to insist on a notice requirement or any other condition or limitation in their guaranty, but having failed to do so, this Court will not write such a condition in after the fact. Absent one of the few recognized exceptions, which the Ritters do not raise in their appeal, this Court will not re-write the bargain reached by the parties into one that is arguably more fair, even if the agreement results in a hard bargain or substantial risk. United Props. Ltd., 2003–NMCA–140, ¶ 28, 134 N.M. 725, 82 P.3d 535 (stating that "New Mexico courts do not have discretion either to relieve parties to a commercial lease of their contractual obligations or to interfere with contractual rights and remedies" (internal quotation marks and citation omitted)); see also Cafeteria Operators, L.P. v. Coronado–Santa Fe Assocs., L.P., 1998–NMCA–005, ¶¶ 20, 23, 124 N.M. 440, 952 P.2d 435 (holding that a commercial building had to be removed because the builder violated a shopping mall lease restriction).

{23} We also observe that, even without the guaranty, the Ritters would most likely be liable for all unpaid rent as assignors, even if Aspen had abandoned the premises. Jacob v. Spurlin, 1999–NMCA–049, ¶¶ 9–12, 127 N.M. 127, 978 P.2d 334 (stating the general rule that an assignment does not relieve an assignor of the duty to pay rent); Mesilla Valley Mall Co. v. Crown Indus., 111 N.M. 663, 665, 808 P.2d 633, 635 (1991) (stating that unless a landlord accepts a tenant's surrender of the premises, the landlord has no

duty to mitigate damages during the term of the lease). While it is not essential to our analysis, we see no benefit in imposing disparate interpretations of a tenant's duty under a guaranty compared with the tenant's obligations under an assignment, particularly where both agreements are intended to facilitate the same activity.

## Breach of the Covenant of Good Faith and Fair Dealing

{24} The Ritters contend that Southwest Malls breached its contractual duty of good faith and fair dealing by not providing notice to the Ritters that rent was going unpaid. The district court, in denying summary judgment to Southwest Malls, found that a material question of fact did exist on this issue in light of the Ritters' claims that Southwest Malls failed to notify them of the unpaid rent for approximately twenty months, even though Southwest Malls was in contact with the Ritters on other matters. Even if all of the Ritters' claims are true, we conclude there is no material question of fact on the issue of whether Southwest Malls violated the covenant of good faith and fair dealing.

{25} We start with a review of the standard of good faith and fair dealing.

Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract. The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party.

Paiz v. State Farm Fire & Cas. Co., 118 N.M. 203, 212, 880 P.2d 300, 309 (1994) (internal quotation marks and citation omitted) limited on other grounds by Sloan v. State Farm Mut. Auto. Ins. Co., 2004–NMSC–004, ¶ 12, 135 N.M. 106, 85 P.3d 230. Our Supreme Court has defined the covenant as follows:

The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party

its rights to those benefits will breach the duty of good faith implicit in the contract. *Planning & Design Solutions v. City of Santa Fe,* 118 N.M. 707, 714, 885 P.2d 628, 635 (1994); see also *Dairyland Ins. Co. v. Herman,* 1998–NMSC–005, ¶ 12, 124 N.M. 624, 954 P.2d 56 (stating that "with insurance contracts, as with every contract, there is an implied covenant of good faith and fair dealing that the insurer will not injure its policyholder's right to receive the full benefits of the contract"); *Azar v. Prudential Ins. Co. of Am.,* 2003–NMCA–062, ¶ 51, 133 N.M. 669, 68 P.3d 909 ("The implied covenant is aimed at making effective the agreement's promises.").

{26} The Ritters rely on a case from the insurance context for the notion that one party to a contract must balance its interests against those of the other party to the contract and cannot be partial to its own interests. *Lujan v. Gonzales,* 84 N.M. 229, 236, 501 P.2d 673, 680 (Ct.App.1972). The Court in Lujan explicitly stated it was not attempting to give a complete definition of good faith "because of the variety of situations held to involve a question of good faith" and used the term good faith "in this case to mean [that] an insurer cannot be partial to its own interests." *Id* Lujan was limited to its facts involving a contract between an insurer and insured, and we decline to impose on one party a duty to balance its interests with that of the other party in all contracts.

{27} Even if all of the Ritters' claims are believed, there is no suggestion that Southwest Malls acted to injure the rights of the Ritters to receive the benefit of their agreement or that it acted to negate any of its promises. *Dairyland Ins. Co.,* 1998–NMSC–005, ¶ 12, 124 N.M. 624, 954 P.2d 56. Southwest Malls promised to allow the Ritters to step out of their role as lessors and operators of the tavern in exchange for the Ritters' promise to guarantee performance of the lease. We fail to see how Southwest Malls' failure to notify the Ritters of Aspen's unpaid rent prevented the Ritters from getting the benefit of their bargain—a bargain that allowed them to assign the remainder of their lease. *Smoot v. Physicians Life Ins. Co.,* 2004–NMCA–027, ¶¶ 13, 14, 135 N.M. 265, 87

P.3d 545 (stating that covenant of good faith is not breached when a party was given the product or service bargained for). As Southwest Malls did not agree to provide the Ritters notice of any missed rental payments and met its obligation to allow the Ritters' assignment, there is no basis to find a breach of the duty of good faith.

{28} Some courts have found that a creditor may breach a duty of good faith by failing to inform a guarantor of facts that materially increase the guarantor's risks. See *Morris v. Columbia Nat'l Bank of Chicago,* 79 B.R. 777, 785–86 (N.D.Ill.1987) (remanding for factual findings where bad faith could be found under Illinois law from creditors' acts and omissions toward guarantor); see Stephens, *supra.* In this case, the plain language of the Ritters' guaranty anticipates the risk of non-payment of rent for the remainder of the lease term, so we cannot see how Southwest Malls' inaction materially increased the risks contemplated in the guaranty. We will not re-write the Ritters' guaranty so as to contemplate no risk whatsoever, or to limit the risk to some arbitrary period less than the remainder of the lease.

{29} Finally, the Ritters point us to authority imposing a duty to disclose facts in certain circumstances, particularly where a builder has a duty to disclose facts to buyers of land. *Krupiak v. Payton,* 90 N.M. 252, 253, 561 P.2d 1345, 1346 (1977). We see no basis to impose a duty on Southwest Malls to disclose the fact that Aspen was not paying rent. In Krupiak, the Supreme Court noted that a duty to disclose facts may arise if a party has superior knowledge that is not within reach of the other party or could not have been discovered by reasonable diligence. *Id* Here, there is no contention that Apen's failure to pay rent was a matter beyond the reach of the Ritters or that they could not have discovered it by reasonable diligence. Southwest Malls had no affirmative duty to apprise the Ritters of the status of Aspen's non-payment of rent under the guaranty, nor was it fraudulent for Southwest Malls not to notify the Ritters about the situation.

## CONCLUSION

{30} We hold that Southwest Malls is entitled to summary judgment as a matter of law. The Ritters signed an absolute restricted guaranty and therefore Southwest Malls was not required to provide any notice of Aspen's default in paying monthly rent. Southwest Malls did not breach the implied covenant of good faith and fair dealing because it did not withhold from the Ritters any of the benefits of the bargain the parties struck in allowing the two lease assignments.

{31} We reverse the district court's denial of summary judgment and remand with instructions to enter judgment in favor of Southwest Malls and to conduct any further proceedings necessary to determine the amount of damages owed under the lease.

{32} **IT IS SO ORDERED.**

I CONCUR: LYNN PICKARD, Judge.

IRA ROBINSON, Judge (dissenting).

ROBINSON, Judge (dissenting).

{33} Rarely have I seen a fact pattern that demands a dissent as much as this one.

{34} I am concerned that the landlord, Southwest Malls, intentionally chose not to notify or even verbally inform the Ritters that their sublessee, Aspen, had defaulted on the lease payments.

{35} What makes it so improper is that Southwest Malls waited twenty months—one month at a time and $10,000 at a time— before notifying the Ritters of the default. And then, how did Southwest Malls finally notify them? It sued them for $200,000 in unpaid rent and other charges.

{36} What is even more disturbing is that Southwest Malls never took any action to evict Aspen or terminate the lease. Southwest Malls allowed Aspen to keep the tavern open, making money, without paying the rent.

{37} What is downright egregious is that, during the time beginning August 2000, when Aspen stopped paying rent, a division of Southwest Malls was in contact with the Ritters over a separate dispute in which it claimed that the Ritters owed it money prior

to the Ritters' assignment of the lease to the Muellers, who later assigned it to Aspen with Southwest Malls' approval. What earthly reason or possible justification could Southwest Malls have had not to inform the Ritters, even by telephone, let alone in writing, that they already owed money for Aspen's default.

{38} Citing *Richardson,* 112 N.M. at 74, 811 P.2d at 572, the majority views the Ritters' guaranty as "a single obligation, and not an open-ended series of obligations, and because the amount guaranteed was reasonably ascertainable, we conclude that this was a restricted guaranty." Majority Opinion ¶ 18.

{39} I do not agree. I see the Ritters' obligation as one that continues on a monthly basis, one month at a time. If the primary obligor, Aspen, pays its rent in a given month, then the Ritters do not need to pay any rent. Then we go on to the next month. If Aspen pays rent during that month, the Ritters have no obligation to pay anything. The same continues to be true each month, one month at a time. Their obligation to pay a month's rent as guarantor only kicks in after Aspen has failed to pay that month's rent. The rent becomes due for the Ritters at the end of a month on which Aspen has defaulted, not at the end of the lease term, twenty months later. But, how can they fulfill their guaranty unless Southwest Malls notifies them of Aspen's default?

{40} The majority acknowledges, citing Morris, 79 B.R. at 785–86, that "a creditor may breach a duty of good faith by failing to inform a guarantor of facts that materially increase the guarantor's risks." Majority Opinion ¶ 28. The majority also states "we cannot see how Southwest Malls' inaction materially increased the risks contemplated in the guaranty." *Id* I can.

{41} Any reasonably prudent man who signs a guaranty on a lease where monthly payments are required contemplates that he will be called upon to make a monthly payment at the time the primary obligor fails to do so—not six months later, not twenty months later, not $200,000 later.

{42} After the first month of Aspen's non-payment, the Ritters could have taken rea-

sonable actions to avoid getting stuck with all the remaining monthly payments under the lease in several different ways. Had Southwest Malls only informed them of Aspen's default, the Ritters could have tried to find a new tavern operator to take over the business and the lease, and could have taken steps to force Aspen out. The Ritters could even have gone back in and operated the tavern themselves, having good reason to do so if they were going to get stuck with the remaining twenty lease payments. To say that the Ritters' risk was not increased is incorrect. It was increased as each month went by that Southwest Malls intentionally failed to notify them of Aspen's continuing default in paying the rent.

{43} At any time during the long period of Aspen's default, the Ritters could have walked through the Mall and would have had no way of knowing that Aspen had stopped paying rent because Southwest Malls let Aspen continue operating the tavern without evicting them.

{44} Since Southwest Malls did not evict Aspen, the Ritters were lulled into a false belief that everything was okay, thanks to Southwest Malls' inaction. I have no doubt that the Ritters suffered prejudice by the action or inaction of Southwest Malls.

{45} Does Southwest Malls' actions or inaction amount to deceit or fraud? Perhaps. Does it amount to bad faith and unfair dealing? It certainly does.

{46} This case reminds me of a puzzle that school children put together. One may think that all the little pieces are being put together in all the correct places. The problem is that when you look at the finished puzzle, you see a picture that is all wrong.

{47} I would affirm the court's denial of Southwest Malls' motion for summary judgment. I, therefore, respectfully dissent.