This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**BANK OF ALBUQUERQUE, N.A.,**

Plaintiff-Appellee,

**v.**                                                                 **NO. 30,810**

**AMBASSADOR DEVELOPMENT, LLC,**
**MARTIN LENZER, PATRICIA LENZER,**
**EDWARD L. ROMERO, Individually and as**
**Personal Representative of the Estate of**
**CAYETANA ROMERO, LAURIE J.**
**ANDERSON, MARTIN LENZER AND**
**PATRICIA D. LENZER REVOCABLE TRUST**
**and LENZER ENTERPRISES, LLC,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Valerie A. Huling, District Judge**

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Angelo J. Artuso
Emil J. Kiehne
Albuquerque, NM

for Appellee

Lorenz Law
Alice T. Lorenz

Albuquerque, NM

for Appellants

**MEMORANDUM OPINION**

**BUSTAMANTE, Judge.**

After a bench trial, the district court entered judgment against Ambassador Development, LLC for the outstanding balance of a $4.8 million loan, plus pre-judgment interest, post-judgment interest, costs, and attorney's fees. On appeal, our task is to determine whether the district court's rulings are supported by substantial evidence. The district court's core rulings are that (1) the disputed loan matured on December 15, 2007, (2) the Bank of Albuquerque did not breach its obligations under the loan agreement, and (3) the members of Ambassador and other guarantors were not relieved of their obligation to guaranty the full amount of the loan. Determining that the record supports these rulings, we affirm.

**BACKGROUND**

In 2003, Edward and Cayetana Romero, Laurie Anderson, and Lenzer Enterprises, LLC, a company owned by Martin and Patricia Lenzer, formed a new venture called Ambassador Development, LLC to take advantage of growth in the new

housing market.[1] Ambassador's business plan was to purchase model homes from builders, lease the homes back to the builders while their subdivisions were being developed and then sell the homes after the builders no longer needed them. To initiate the plan, Ambassador approached the Bank of Albuquerque's (Bank) private banking department for a line of credit of $1.2 million. Bank agreed to the loan[2] provided that Ambassador members submit personal guaranties and give Bank first mortgages on the homes. Also, Ambassador was to pay Bank monthly for interest accrued on the purchase amounts of the homes. The loan documents included a business loan agreement (BLA), promissory note, commercial guaranties, and a notice of final agreement (NFA), among others. After the initial transaction in 2003, the line of credit was renewed[3] three times and eventually increased to $4.8 million. At each renewal, Bank prepared and Ambassador executed a BLA, promissory note, and NFA in addition to other documents. We refer to each document or set of documents by the year in which they were signed.

---

[1]Unless context requires otherwise, we will refer to all Defendants/Appellants collectively as "Ambassador."

[2]We use the terms "line of credit" and "loan" interchangeably in this Opinion.

[3]Ambassador argues that each set of documents represented a new loan, rather than a renewal of the initial loan executed in 2003. We address this contention more fully below.

After a series of disagreements about the terms of the loan, which are the subject of this dispute, Bank filed a complaint seeking recovery of all outstanding debt and foreclosure on Ambassador's properties in Bernalillo County. Ambassador answered with affirmative defenses and a counterclaim alleging that Bank had breached the 2006 BLA and acted "contrary to the doctrine of good faith and fair dealing[]." After a bench trial, the district court entered judgment for Bank for the remaining balance of the loan (over $1.7 million), pre-judgment interest, post-judgment interest, costs and attorney's fees. Ambassador appealed. Additional facts are included as needed in our analysis of Ambassador's arguments.

**DISCUSSION**

We address Ambassador's arguments in the order presented.

**Maturity Dates**

In its first argument, Ambassador maintains that Bank could not declare a default based on Ambassador's failure to pay the loan in full on December 15, 2007, because the 2006 BLA did not include a "date certain maturity date." Therefore, "[b]ecause its 2006 BLA contained a flexible maturity date, . . . Bank lacked the right to declare a default." It is undisputed that the 2003 loan documents specified that the amount of the loan was due and payable in full one year later on August 19, 2004. Similarly, the parties do not dispute that 2004 and 2005 loan documents specified a

maturity date. The 2005 loan documents increased the line of credit to $4.8 million with a maturity date of December 15, 2006. One day before the loan was to mature, new documents were executed with no increase in the line of credit. At trial the parties disputed whether the 2006 loan documents set forth a specific maturity date.

Questioning whether Ambassador sufficiently preserved this issue for appeal, Bank asserts that Ambassador argued at trial that "the parties had *always* agreed that the loans had no firm maturity date, but now . . . [Ambassador is] changing [its] story" to focus on an alleged inconsistency in the loan documents. *See Am. Bank of Commerce v. U. S. Fid. & Guar. Co.*, 85 N.M. 478, 478, 513 P.2d 1260, 1260 (1973) ("A party cannot change his theory on appeal."). We determine that Ambassador sufficiently apprised the district court of both theories to preserve them for appeal. Ambassador asserted in its answer to the complaint that Bank's "cause of action is contrary to the [BLA and the BLA] attached to the [c]omplaint . . . continues. Therefore this cause of action is premature." Ambassador asserted in a trial memorandum requested by the district court that the language of the 2006 BLA "Term" provision and other parts of that agreement were in conflict. Finally, we note that Ambassador requested findings of fact relevant to an alleged conflict in the loan documents. We conclude that both of Ambassador's arguments as to why there was no default on the 2006 agreement were sufficiently before the district court to preserve

them for review. *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct. App. 1987).

Ambassador argues first that the 2006 BLA is ambiguous as to when it matures. Next it argues that "[t]he district court failed to apply . . . basic rules of [contract] construction and so erred by adopting" findings stating that the 2006 agreement matured on December 15, 2007. "Whether a contractual provision is ambiguous is a question of law, which we review de novo on appeal." *Sitterly v. Matthews*, 2000-NMCA-037, ¶ 15, 129 N.M. 134, 2 P.3d 871. "Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact." *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). When "the parties do not offer evidence of the facts . . . surrounding execution of the agreement . . . , the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation." *Id.* at 782, 845 P.2d at 1236. When this is the case, our review on appeal is de novo. *Id.* On the other hand, any "factual issues . . . presented by an ambiguity must be resolved by the [fact finder] with the benefit of a full evidentiary hearing prior to deciding breach and damages." *Id.* In the latter case, we will affirm the district court when its resolution of the ambiguity is supported by substantial evidence. *City of Sunland Park v. Harris News, Inc.*, 2005-NMCA-128,

¶ 21, 138 N.M. 588, 124 P.3d 566.  In reviewing a substantial evidence claim, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached."  *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177.  "Additionally we will not reweigh the evidence nor substitute our judgment for that of the fact finder."  *Id.*

The district court did not make a finding that the 2006 BLA was ambiguous, nor did it make findings from which we can determine that it resolved any ambiguity as a matter of law using the canons of construction.  Assuming the district court did determine the 2006 loan documents were ambiguous, we conclude that it resolved any ambiguity based on the facts after a "full evidentiary hearing."  *Mark V*, 114 N.M. at 782, 845 P.2d at 1236.  Here, both Bank and Ambassador presented testimony about the circumstances surrounding the agreement and Bank presented correspondence about the agreement between Bank and Ambassador.  Although Mr. Romero testified that he understood that the lifetime of the loan "was until the homes were sold," and the "Term" provision in the 2006 BLA is silent as to its maturity date, Patricia Lenzer, who signed the 2006 loan documents on behalf of Ambassador, testified that she understood Bank would not approve an agreement with a maturity date over a year from the date of execution and several Ambassador representatives acknowledged that

7

each loan until the 2006 loan expressly matured one year from the execution date. In addition, in correspondence prior to December 15, 2007, Bank repeatedly stated that the 2006 loan would mature on that date. Ambassador did not present evidence that it challenged the maturity date in its responses. This evidence supports the district court's finding that the 2006 loan matured on December 15, 2007.

**Ambassador's Counterclaims**

Ambassador next argues that Bank breached the terms of the 2006 BLA when it extracted over $50,000 from Ambassador's account under the BLA's setoff provision without having obtained Ambassador's certification of the amount owed. It also argues that Bank acted in bad faith in its negotiations with Ambassador over extension of the loan. Ambassador contends that because of these breaches, Bank was precluded from "declaring Ambassador in default, or filing suit against it, at least until such time as the Bank cured those breaches."

Ambassador's first allegation of breach is based on a curtailment provision in the 2006 BLA that reads as follows:

> AFFIRMATIVE COVENANTS. *Borrower* covenants and agrees with Lender that, so long as this Agreement remains in effect, *Borrower will*:
>
> . . . .
>
> Financial Covenants and Ratios. Comply with the following covenants and ratios:

8

. . . .

> Other Requirements. A curtailment of 5% of the original funded balance will be required every six months from the builder release date of the specific home to be sold.

> Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, . . . and *certified by Borrower* as being true and correct.

Ambassador argues that under this provision Bank had an obligation to "ask for and obtain Ambassador's certification of its [curtailment] calculations before extracting money from Ambassador's accounts" and that Bank's failure to do so was a material breach of the agreement. Bank maintains that the curtailment provision places the onus on Ambassador to provide certification of the curtailment amounts, not on Bank to obtain them. Thus, it maintains that it did not breach the curtailment provision.

Although Ambassador also argues on appeal that the curtailment provision and right of setoff provision create an ambiguity that the district court failed to address properly, it does not explain how this argument was preserved below nor direct us to evidence of preservation in the record. "[O]n appeal, the party must specifically point out where, in the record, the party invoked the court's ruling on the issue. Absent that citation to the record or any obvious preservation, we will not consider the issue." *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273; *In re Norwest Bank of N.M., N.A.*, 2003-NMCA-128, ¶ 30, 134

N.M. 516, 80 P.3d 98 (stating that this Court will not search the record for evidence of preservation).

Ambassador also argues that Bank is precluded from arguing that Ambassador was responsible for certifying the curtailment calculations because Bank did not argue this below. We disagree. In the district court, Ambassador argued that Bank failed to obtain a certification; this argument assumes that Bank was required to do so. The district court thus had to have considered which party bore the burden under the curtailment provision in order to arrive at its conclusion that the Bank did not breach its obligations. This argument was preserved. *See Woolwine*, 106 N.M. at 496, 745 P.2d at 721.

Ambassador attacks the district court's findings of fact pertaining to the duties imposed by the curtailment provision of the 2006 BLA. It also challenges the district court's finding of fact related to Bank's intent behind offering an extension of the agreement. We review those findings to determine whether they are supported by substantial evidence. *In re Valdez*, 88 N.M. 338, 343, 540 P.2d 818, 823 (1975) ("It is a long-standing rule in New Mexico that findings of fact which are supported by substantial evidence will not be disturbed on appeal."). To the extent Ambassador attacks the district court's conclusion of law regarding breach, "the standard for review is whether the law correctly was applied to the facts, viewing them in a manner

most favorable to the prevailing party, indulging all reasonable inferences in support of the court's decision, and disregarding all inferences or evidence to the contrary." *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 113 N.M. 9, 12, 820 P.2d 1323, 1326 (1991).

We conclude that the district court did not err in determining that Bank satisfied its obligations with respect to the curtailment amounts and right of setoff. The district court found that "[d]espite the Bank's repeated requests, Ambassador never provided . . . Bank with the information necessary to verify Ambassador's calculation of the curtailment payment." It also concluded that "[t]he Bank has performed all of its obligations under the Loan documents." Implicit in these findings and conclusions is a determination that Bank had no duty to wait until Ambassador certified the calculations before it took action under the "right of setoff" clause in the BLA. Ambassador's argument that it was Bank's responsibility to obtain a certification of the curtailment amount would require us to ignore the plain meaning of the contract language. The introduction to the curtailment provision indicates that it places responsibility on Ambassador by beginning "Borrower will . . . ." Similarly, the curtailment provision states that the computation must be "certified by Borrower." Nothing in this section places a burden on Bank. Neither does anything in this section

11

prevent Bank from calculating the curtailment itself in the absence of certified calculations by Ambassador.

In addition, the record reveals that Ambassador had several opportunities to provide the certification before Bank accessed its account. When no payment was made on the due date of June 15, 2007, Bank notified Ambassador that the first curtailment payment of $50,463.65 was due and extended the due date to July 31, 2007. When no payment was made on July 31, 2007, Bank extracted that amount in two transactions in August and September from Ambassador's account under the setoff provision. Under this provision, "[Ambassador] authorizes [Bank], to the extent permitted by applicable law, to charge or setoff all sums owing on the [i]ndebtedness against any and all [of Ambassador's] accounts [with Bank]." "Indebtedness" is defined in the BLA as "the indebtedness evidenced by the [n]ote or [r]elated [d]ocuments, including all principal and interest together with all other indebtedness and costs and expenses for which [Ambassador] is responsible under this Agreement or under any of the [r]elated [d]ocuments." Bank provided testimony it notified Ambassador that it was going to extract the funds from Ambassador's account. Although some correspondence indicated that Ambassador was not aware that Bank was going to extract the curtailment amount, neither Patricia Lenzer, to whom Bank allegedly gave notice, nor Jim Griffin, the Ambassador spokesperson, testified on this

issue. Finally, after Ambassador objected in October 2007 to the amounts extracted, Bank provided its calculations. Although there was evidence that Ambassador disagreed with Bank's calculations, Bank presented testimony that Ambassador never provided its own certified calculations, and Ambassador does not direct us to evidence to the contrary. We conclude that substantial evidence supported the district court's findings and conclusion that Bank did not breach any obligations pertaining to the curtailment payments.

Ambassador next argues that Bank acted in bad faith when "it attempted to obtain signatures, purportedly for a loan extension, that in actuality served a different purpose —. . . making Ambassador's members liable as guarantors for a loan the Bank intended to immediately call." It contends that the district court erred by finding that "Bank prepared and sent to Ambassador on December 12, 2007, documents necessary to extend the loan's maturity date to February 15, 2008" in order to allow time for Ambassador to provide the necessary financial information for a loan renewal, when Bank really had a different intent. Ambassador also finds error in the district court's conclusion that "[t]he Bank has proceeded in good faith, and [Ambassador]'s counterclaims are without merit."

"[E]very contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract. *WXI/Z*

*Sw. Malls v. Mueller*, 2005-NMCA-046, ¶ 25, 137 N.M. 343, 110 P.3d 1080 (internal quotation marks and citation omitted). To show breach of this duty, a plaintiff must demonstrate "bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." *Id.* (internal quotation marks and citation omitted).

Ambassador's argument is unavailing, not least because the district court's finding pertains to Bank's intent in December 2007, *before* it sent the extension documents to Ambassador, rather than its intent in January 2008, *after* Ambassador refused to sign them. The evidence supports the district court's finding as to Bank's intent in December 2007, when it first offered an extension. Bank presented correspondence between Bank and Ambassador in which Bank sought the information necessary for renewal of the 2006 loan several times before it matured on December 15, 2007. A Bank representative testified that an extension of the maturity date to February 15, 2008, was approved because Bank and Ambassador "needed more time to compile financial statements" for the renewal since they were not provided before the December 15, 2007, maturity date. Bank presented a copy of an internal document in which the loan officer stated that "[t]his time extension is necessary in order to compile year[-]end financial statements, and reappraise and evaluate the subject collateral houses."

Ambassador presented evidence that in early January Bank had determined to ask Ambassador to pay in full or relocate the loan and argues that the district court erred by not adopting Ambassador's requested findings of fact to the effect that Bank's intent "was actually to get [Ambassador] to bring the Bank current (by the Bank's disputed calculation), obtain signatures that would reinstate the individuals as guarantors, and then force [Ambassador] to pay off the loan."[4] Ambassador fails, however, to point out how Bank's offer to extend the maturity date of the loan was necessarily an effort to "wrongfully and intentionally us[e] the contract to the detriment of the other party" when Ambassador had already defaulted by not paying the loan in full on December 15, 2007. *WXI/Z Sw. Malls*, 2005-NMCA-046, ¶ 25 (internal quotation marks and citation omitted).

More to the point, Ambassador fails to demonstrate why the district court's decision to the contrary is not supported by substantial evidence. When considering contradictory testimony or contrasting arguments about a person's subjective intent, a fact finder's decision one way or the other is well nigh unassailable. There is

---

[4]Ambassador argues that the district court erred by not adopting proposed findings of fact 72-79. Because it does not develop arguments relevant to findings of fact 72-77 and 79 in its brief in chief, we do not address those findings. *Headley v. Morgan Mngmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076.

nothing in the circumstances here which would compel a finding in favor of Ambassador and its position. As such, the district court's ruling must stand.

Much of Ambassador's argument seems to hinge on the notion that Bank sought to "reinstate" the guarantors through their signatures on the extension documents. Again, this might have been a reasonable argument to advance at trial, but on appeal must fail. The district court had competing arguments and evidence to consider. Nothing compelled it to choose Ambassador's side of the controversy and there is even less compelling us to disagree with the district court's choice. Further, as we discuss more fully below, the guarantors were already liable for the 2006 loan and any extension or renewal of it, so the inclusion of signature lines for guarantors on the extension or renewal documents is immaterial. The district court did not err in concluding that Bank acted in good faith.

**Guaranties**

In its final argument, Ambassador asserts that the district court erred in determining that the guaranties executed in 2003 and 2004 were not limited to those years. All of the Ambassador members signed commercial guaranties in August 2003 and signed the 2003 NFA as guarantors. In 2004, when the loan was increased to $3.8 million, Martin and Patricia Lenzer signed a guaranty on behalf of the Lenzer Trust

16

(Trust). It is undisputed that none of the guarantors revoked their guaranties in writing.

Ambassador makes three intertwined arguments to support its position that the guaranties do not apply to the 2006 loan. Ambassador's first assertion is that the guaranty language to which Ambassador's members agreed in 2003 must be construed to limit their obligations to the loan amount covered by the initial loan agreement, i.e., only $1.2 million. Next, it argues that its members were released in 2004 because the Trust replaced them as guarantor. Finally, it argues that the Trust was released as guarantor beginning with the 2005 renewal of the loan. Ambassador maintains that, consequently, neither Ambassador's members nor the Trust are guarantors for the 2006 loan.

Ambassador's arguments are challenges to the district court's findings of fact. Thus, we review those findings to determine if they are supported by substantial evidence. *In re Valdez*, 88 N.M. at 343, 540 P.2d at 823. We note that Ambassador attempts to argue that some of the district court's findings are actually conclusions of law, and therefore entitled to no deference. Ambassador specifically identifies finding number 39, in which the district court found that Ambassador represented to Bank that the guarantors continued to guaranty the loan in 2005 and 2006 and finding number 31, in which the district court found that the guaranty given by the Trust was in

addition to, rather than a replacement for, that given by the members. We simply disagree with Ambassador's assertion. These statements are findings of ultimate facts, not legal conclusions. *Scott Graphics, Inc. v. Mahaney*, 89 N.M. 208, 209, 549 P.2d 623, 624 (Ct. App. 1976) ("[U]ltimate facts are factual conclusions deduced by a trial court from the evidentiary facts."). Thus, if these findings are supported by substantial evidence, we will affirm them.

Ambassador first argues that "[w]hen read as part of the overall loan contract, and in light of the circumstances at the time they were signed . . . the applicable rules of construction lead to the conclusion that the guaranties could only have [applied] within the confines of the finite, one-time arrangement contemplated." Specifically, Ambassador points to testimony that Ambassador could not have expected a renewal of the 2003 loan and argues that Bank "treat[ed] each of its loans as separate one-year agreements" and included in each set of loan documents "language that indicated new guaranties needed to be signed for each new loan." Ambassador's argument is based on two assumptions: first, that these circumstances indicate that each agreement was for a new loan unrelated to the prior loan and second, that these circumstances made the guaranties ambiguous and, therefore, the guaranty language requires construction. *See WXI/Z Sw. Malls*, 2005-NMCA-046, ¶ 22 (declining to construe a guaranty where the guaranty was "clear and unambiguous.").

The district court appears to have rejected Ambassador's argument that each set of loan documents represented a separate loan. Although it did not make a finding specific to this issue, the district court referred repeatedly to "renewal" of the loan. The loan documents support this determination. Each promissory note signed by Ambassador states, "This Promissory Note is an extension, renewal and/or modification of the [previous] Note . . . from the Borrower to Lender and is not a novation and shall be deemed effective as of the date set forth as the date such Promissory Note would have matured if not otherwise renewed or extended hereby." The 2004 NFA states, "This is a secured renewal of the . . . Note dated AUGUST 19, 2003 . . . ." The 2005 and 2006 NFAs state, "This is a secured renewal loan." Each of these NFAs was signed by Ambassador members or on Ambassador's behalf under a statement certifying that the signer read and understood it.

Ambassador's second assumption is that the circumstances surrounding the guaranties make the guaranty language ambiguous. Having concluded that the district court did not err in determining that the loan here was one loan that was renewed three times, we conclude that renewal of the loan did not create an ambiguity. In addition, we have examined the guaranty documents and conclude that, like in *WXI/Z Sw. Malls*, they are not ambiguous. First, each guaranty stated that the amount of the

19

guaranty is unlimited and that "the obligations of [g]uarantor are continuing."[5] Each guaranty stated that "[t]he [i]ndebtedness guaranteed by this [g]uaranty includes any and all of [b]orrower's indebtedness to [l]ender and . . . includes any and all of [b]orrower's liabilities, obligations and debts to [l]ender, now existing or hereinafter incurred or created, including without limitation, all loans, advances, interests, costs, [and] debts . . . ." In each case, the guarantors authorized Bank to

> without notice . . . and without lessening [g]uarantor's liability under this [g]uaranty, . . . to make one or more additional secured or unsecured loans to [b]orrower . . . or otherwise extend additional credit to [b]orrower; [] to alter, compromise, renew, extend, accelerate, or otherwise to change one or more times the time for payment or other terms of the [i]ndebtedness or any part of the [i]ndebtedness, included increases and decreases of the rate of [i]nterest on the [i]ndebtedness; extensions may be repeated and may be for longer than the original loan term[.]

Finally, each guarantor signed under a statement in all caps that "EACH GUARANTOR UNDERSTANDS THAT . . . THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY[.]" That section specified that the guaranty

---

[5]Neither party directs us to the legal significance, if any, of the description of the guaranties as "continuing." "A continuing guaranty is one in which a guarantor assumes liability, but the amount of debt or time for payment remains undefined, such as a line of credit." *WXI/Z Sw. Malls*, 2005-NMCA-046, ¶ 15 (discussing the differences between continuing and restricted guaranties). We therefore do not explore the implications of this description.

would "continue in full force until all [i]ndebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied" and that revocation of the guaranty requires written notice.

The district court found that "Defendants . . . each executed a separate [c]ommercial [g]uaranty in which they promised, in part, to pay all of Ambassador's obligations . . . then owing, or in the future owed to . . . the Bank, without limitation as to the amount owed." It also found that "[e]ach [c]ommercial [g]uaranty provides [that] '[t]his [g]uaranty . . . will continue in full force until all [i]ndebtedness incurred or contracted before receipt by [l]ender of any notice of revocation shall have been fully and finally paid and satisfied and all of [g]uarantor's other obligations under this [g]uaranty shall have been performed in full.' " We conclude that these findings are based on the unambiguous language of the guaranties and do not require construction. *WXI/Z Sw. Malls*, 2005-NMCA-046, ¶ 22.

Ambassador next argues that its members were released when the Trust replaced them as guarantor. The district court found that "[t]he [c]ommercial [g]uaranty given by the Trust was in addition to and not in substitution of the [c]ommercial [g]uarantees given by the other [g]uarantors in August 2003." Ambassador presented testimony by Ms. Lenzer that there was an oral agreement by Bank to release the individual guarantors and replace them with the Trust and

21

testimony by other members that they understood that the Trust replaced them as guarantor. Ambassador also relies on evidence that Bank did not require the guarantors to submit financial statements within the time frame required by the guaranty as an indication that Bank had released the guarantors. Finally, it points to the 2004 loan documents, in which only the Trust is named as a guarantor. It argues that "[t]his . . . is a written representation by the Bank that Ambassador's members were no longer guarantors and formalizes the termination of their status as guarantors."

In spite of this evidence to the contrary, the district court's finding is supported by substantial evidence. The district court had discretion to reject Ms. Lenzer's testimony as to the oral agreement as well as the testimony of the Ambassador members as to their understanding. In addition, its rejection of Ambassador's argument that the NFA was a representation of Bank's release of the guarantors is supported by the language immediately preceding the list of guarantors, which states, "[t]he term "Parties" means [Bank] and any and all entities or individuals who are obligated to repay the loan or have pledged property as security for the Loan, including without limitation the following[.]" This language encompasses parties who may be obligated to Bank that are not listed on that form. Similarly, the fact that Bank did not strictly enforce its own requirements for financial statements does not require

a determination that Bank released the guarantors. It was within the district court's discretion to give that fact less weight than Ambassador urged it to. Finally, Bank presented internal documents as evidence that it did not intend to release the guarantors and that the loan and each renewal was "guarantor dependent." These facts, in conjunction with the plain language of the guaranties, support the district court's finding that the Trust guaranty was in addition to, not a substitute for, the guaranties signed by Ambassador's members.

Ambassador relies on *Beal Bank v. Siems*, 670 N.W.2d 119, 127 (Iowa 2003) for the proposition that "failure to list the alleged guarantors on a subsequent loan or to provide them with the [NFA] . . . constitute[s] compelling evidence that the Bank had released the guarantors." We are not persuaded. Ambassador argues that, because Bank did not list the individual members on the 2004 NFA and did not provide the 2005 and 2006 NFAs to Ambassador's members, like the creditor in *Beal Bank*, Bank had abandoned their guaranties. This argument misapprehends the standard of review on appeal. The *Beal Bank* court holding indicates only that under the facts of that case, the evidence was sufficient to affirm the lower court's ruling. It does not mean that in all cases similar conduct by a bank will constitute abandonment of the guaranty. Here, the district court considered evidence presented

23

by both parties, including evidence similar to that in *Beal Bank*. Its findings to the effect that the guaranties were not abandoned are supported by substantial evidence.

Finally, Ambassador argues that the Trust was released as guarantor beginning with the 2005 renewal of the loan. The only support Ambassador provides for this contention is that the Trust is not listed as guarantor in any loan documents after the end of the 2004-2005 agreement and testimony by Ms. Lenzer that she told Bank the Trust was not willing to continue as guarantor. In the 2005 and 2006 loan documents, only the individual guarantors and Lenzer Enterprises are listed as guarantors. Ambassador argues that because only these guarantors are listed, the Trust was released.

We note that reliance on this fact appears to conflict with Ambassador's contention that the individual guarantors were released after the 2003 agreement period ended. In any case, the district court concluded that the individual guarantors, Lenzer Enterprises, and the Lenzer Trust were jointly and severally liable for the "principal on the Note, plus interest in accordance with the terms of the Note, plus costs and expenses including reasonable attorneys' fees." In support of this conclusion, the district court found, in addition to those findings discussed above, that (1) "none of the Guarantors has ever provided a written notice of revocation of their respective [c]ommercial [g]uaranty[;]" (2) "[w]hen Ambassador renewed the loan in

24

2005, and again in 2006, it represented to the Bank that each of the Guarantors continued to be a guarantor on the loan[;]" and (3) "[t]he majority of the Guarantors in this case are sophisticated investors with extensive business experience and assets." Each of these findings is supported by testimony. Ambassador members testified that they never revoked their guaranties in writing, Ms. Lenzer testified that she signed 2005 and 2006 documents listing the guarantors on behalf of Ambassador and that she read and understood the documents, and several witnesses and exhibits addressed the Ambassador members' experience in business. We will not disturb the district court's findings and conclusions on this matter. *Las Cruces Prof'l Fire Fighters*, 1997-NMCA-044, ¶ 12.

**CONCLUSION**

The judgment of the district court is affirmed. Pursuant to the loan documents we award attorney's fees in favor of Bank for work performed on appeal. We remand to the district court for calculation of a reasonable fee.

**IT IS SO ORDERED.**

**MICHAEL D. BUSTAMANTE, Judge**

25

WE CONCUR:

_____
CYNTHIA A. FRY, Judge


_____
J. MILES HANISEE, Judge